Seth W. Wiener, California State Bar No. 203747
Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
Telephone: (925) 487-5607
Email: seth@sethwienerlaw.com

W. Cook Alciati (*pro hac vice to be filed*)
Gardella Grace P.A.
80 M Street SE, 1st Floor
Washington D.C., 20003
Telephone: (703) 721-8379
Email: calciati@gardellagrace.com

Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAG SHOT GOLF LLC, SCRATCH GOLF ACADEMY LLC, and GGG MARKETING LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. | Case No.: 3:21-cv-01495 <br><br> **COMPLAINT** <br><br> 1) **VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ*.,** <br> 2) **BREACH OF CONTRACT,** <br> 3) **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND** <br> 4) **FRAUD** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Lag Shot Golf LLC, Scratch Golf Academy LLC, and GGG Marketing LLC allege as follows against Defendant Facebook, Inc.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ*., BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

## INTRODUCTION AND OVERVIEW

1.        Facebook, Inc. ("Facebook") sells advertising services to individuals and businesses desiring to promote goods or services on the Facebook platform.[1] Facebook represents that it has 10 million business advertising customers, the vast majority of which are small and medium-sized businesses.[2]  Plaintiffs are among the businesses that have purchased Facebook's advertising services.

2.        Modern business advertisers like Plaintiffs have little choice but to advertise with Facebook. Facebook (which now owns Instagram and WhatsApp) has over 70% market share in the social media market.[3] If a business wants to avoid using Facebook advertising, it will reach only about 30% of the social media market.

3.        Facebook's own Advertising Policies, which are integrated into the Facebook Terms of Service, explain the ad review process and state that if an ad is disapproved, Facebook will provide an email with details explaining how the user can create a compliant ad.[4]  To this day, those Advertising Policies state that "[i]f your ad doesn't get approved, we'll send you an email with details that explain why. Using the information in your disapproval email, you can edit your ad and create a compliant one."

4.        Contrary to this representation, and starting at least as early as the second quarter of 2019, Facebook has routinely rejected ads without providing an explanation sufficient to enable the advertisers to create compliant ads.  Plaintiffs' advertisements are among the ads that have been rejected without the explanation promised under Facebook's policies.

---

[1] https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html; https://www.investopedia.com/ask/answers/120114/how-does-facebook-fb-make-money.asp.
[2] https://www.facebook.com/iq/insights-to-go/200m-more-than-200-million-businesses-use-our-free-tools-to-connect-with-customers-we-also-have-more-than-10-million-active-advertisers-across-our-services-the-vast-majority-of-which-are-small-and-medium-sized-businesses; note that the information in https://www.nytimes.com/2021/02/11/style/disabled-fashion-facebook-discrimination.html?referringSource=articleShare (mentioning 3 million business advertisers) is from 2016.
[3] *See* https://gs.statcounter.com/social-media-stats.
[4] *See* https://www.facebook.com/policies/ads.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

5.      These issues are so commonly reported by Facebook business advertisers that the topic was the subject of a recent article by the New York Times.  In particular, the New York Times reported that many Facebook business advertisers have been finding it "impossible" to create ads which do not trigger an automated rejection, despite repeated attempts, because the rejections are "very vague" and do not provide the promised information, *i.e.*, details explaining how to create a compliant ad.[5]

6.      Tellingly, even Facebook representatives have reported being unable to determine why their own ad accounts have been disabled, and in at least one such instance a Facebook representative reported that he was advertising on his mother's account for several months while his own automated review was pending.[6]

7.      One common consequence of Facebook's failure to provide the promised explanations is that business advertisers' ads are repeatedly rejected and, after several such ad rejections have accumulated, Facebook suspends or revokes the advertising privileges, also without explanation.  As discussed herein, business advertisers widely report the same sequence of events: ads are rejected without explanation, the business guesses at the revisions which might be required, the re-submitted ads are also rejected, and after several such rejections the business' advertising privileges are suspended or revoked without explanation.  On information and belief, such suspensions and revocations are the direct and proximate result of Facebook's failure to provide the promised explanations for ad rejections.

8.      Upon information and belief, such wrongful suspensions and revocations of advertising privileges have caused the collapse of many businesses.  As just one example, a Business Insider article reported that Facebook disabled an account without explanation despite the fact that the owner had spent $46 million dollars on Facebook advertising from 2006 to

---

[5] *See* https://www.nytimes.com/2021/02/11/style/disabled-fashion-facebook-discrimination.html?referringSource=articleShare.
[6] https://www.reddit.com/r/PPC/comments/l65q4v/heres_proof_that_facebook_is_a_mess_right_now/, last accessed on Feb. 2, 2021.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

2020.[7] Facebook's decision to completely disable that business' advertising privileges "without warning or explanation" caused the loss of several pages that had amassed "25 million enthusiastic fans" over the course of several years.[8]  According to the business, the revocations came out of the blue, when the business' Facebook portal contemporaneously showed that none of the advertising pages had any violations.[9] The business owner reported that two of his companies had been "shut down" as a result of Facebook's actions.[10]

9.     Plaintiffs' experience has been similar.  Plaintiffs' ads have been systematically rejected without the promised explanations.  After each of Plaintiffs' ad accounts accumulated several such rejections, each was suspended by Facebook without explanation.  After accumulation of several such ad account suspensions, Plaintiffs' advertising privileges were completely suspended or revoked, also without any explanation.

10.     Under California Law, Facebook has a duty to deliver its advertising services in good faith and to deal with its advertisers fairly.  Here, that requires Facebook to provide advertisers reasonable advance notice of an impending suspension or revocation of advertising privileges and a fair opportunity to remedy the perceived defects in order to avoid such a suspension or revocation.

11.     Facebook has violated that duty and the underlying contract established by Facebook's Terms of Service. Facebook could have, but deliberately chose not to, devote appropriate resources (including but not limited to human employees or contractors) to ensure that the required explanations for ad rejections and advance notice of advertising suspensions or revocations were supplied to business advertisers.  Instead, Facebook chose to maximize its profits, which burgeoned to $29.1 billion in 2020.[11]

---

[7] https://www.businessinsider.com/facebook-removed-shared-ceo-spent-46-million-on-ads-2021-1.
[8] https://jordan-shared.medium.com/after-spending-over-57-million-on-facebook-ads-they-kicked-me-and-my-pages-off-without-warning-c6d7e611b01c
[9] *Id.*
[10] *Id.*
[11] https://www.investopedia.com/ask/answers/120114/how-does-facebook-fb-make-money.asp.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

12.     Like the rest of the general public that purchases advertising services from Facebook, Plaintiffs have suffered economic harm during the still-pending suspension of their advertising privileges, which occurred either without explanation or with only vague explanations that were insufficient to enable Plaintiffs to create compliant ads or avoid suspension of advertising privileges, in direct contravention of Facebook's Advertising Policies and duties.

13.     On information and belief, Facebook has been aware of this problem since at least 2019 and has deliberately and willfully failed to devote appropriate resources to address the problem. According to an online message board, Facebook representatives have specifically told ad account holders that the reasons underlying the account closures would not be shared.[12]  On information and belief, Facebook made the conscious, willful, and deliberate decision to withhold the contractually assured explanations during the ad review process and the required advance notice of advertising privilege suspensions or revocations to minimize costs and maximize profits through the use of an unduly automated ad review process.

14.     As a consequence of Facebook's willful actions and omissions in this regard, many of Facebook's business advertisers have gone out of business.  Facebook business advertisers, including Plaintiffs, also paid a higher price for advertisements than they otherwise would have had they understood that Facebook would not provide the contracted-for advertising support. Facebook business advertisers, including Plaintiffs, further suffered lost revenue and failed to enjoy the benefit of their bargains with Facebook, including in that businesses such as Plaintiffs devoted substantial time, effort and money developing Facebook advertising campaigns and attracting millions of followers only to have their accounts suddenly closed or their privileges suspended without explanation or warning.

---

[12] https://www.reddit.com/r/PPC/comments/l65q4v/heres_proof_that_facebook_is_a_mess_right_now/, last accessed on Feb. 2, 2021.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

15.     Plaintiffs accordingly seek public injunctive relief requiring Facebook to comply with its Advertising Policies and meet its related duty to provide advance notice of advertising privilege suspensions or revocations for the benefit of the public at large that relies on Facebook advertising to reach 70% of the social media market.  Plaintiffs also seek compensation and punitive damages for violations of California's Unfair Competition Law and also for breach of contract, breach of Facebook's implied covenant of good faith and fair dealing, and fraud.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and Plaintiffs are citizens of a state different from Defendant.

17.     This Court has personal jurisdiction over Defendant because Facebook is headquartered in California and conducts business in the state of California.

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District. Venue is also proper because Facebook's Terms of Service require that claims be resolved "exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County…."

## PARTIES

19.     Plaintiff Lag Shot Golf LLC is a Florida limited liability company. All member(s) of Plaintiff Lag Shot Golf LLC reside in Florida.

20.     Plaintiff Scratch Golf Academy LLC is a Florida limited liability company. All member(s) of Plaintiff Scratch Golf Academy LLC reside in Florida.

21.     Plaintiff GGG Marketing LLC is a Florida limited liability company. All member(s) of Plaintiff GGG Marketing LLC reside in Florida.

22.     Defendant Facebook, Inc. is incorporated in Delaware, and its principal place of business is 1 Hacker Way, Menlo Park, CA 94025.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

**FACTUAL ALLEGATIONS**

23.    Facebook represents that it sold advertising services to over 10 million advertisers in 2020.[13]  Facebook represents that the "vast majority" of those advertisers are "small and medium-sized businesses."[14]

24.    Businesses have little choice but to advertise with Facebook. Facebook (which now owns Instagram and WhatsApp) accounted for about 70% of all social media site visits in the U.S. in January 2021.[15] Pinterest trails far behind with about 12% market share and Twitter comes in a distant third at about 10% market share.

25.    Facebook has acquired a monopoly or an otherwise dominant market position over social media advertising. As noted in the Federal Trade Commission's and the State Attorney Generals' antitrust complaints, Facebook is the world's dominant personal social networking service and has monopoly or otherwise dominant market power in a market for personal social networking services.[16]  The FTC complaint correctly alleges as follows:

> Facebook is the world's dominant online social network. More than 3 billion people regularly use Facebook's services to connect with friends and family and enrich their social lives. But not content with attracting and retaining users through competition on the merits, Facebook has maintained its monopoly position by buying up companies that present competitive threats and by imposing restrictive policies that unjustifiably hinder actual or potential rivals that Facebook does not or cannot acquire.[17]

---

[13] https://www.facebook.com/iq/insights-to-go/200m-more-than-200-million-businesses-use-our-free-tools-to-connect-with-customers-we-also-have-more-than-10-million-active-advertisers-across-our-services-the-vast-majority-of-which-are-small-and-medium-sized-businesses.

[14] *Id.*

[15] *See* https://gs.statcounter.com/social-media-stats.

[16] *FTC v. Facebook, Inc.*, No. 1:20-cv-03590 (D.D.C. Jan. 13, 2021); *New York v. Facebook, Inc.*, 1:20-cv-03589 (D.D.C. Dec. 9, 2020).

[17] *FTC v. Facebook, Inc.*, No. 1:20-cv-03590 (D.D.C. Jan. 13, 2021).

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

26.     Due to Facebook's monopoly power or otherwise dominant market position over social media advertising and/or related anticompetitive behavior, businesses have no practical choice but to advertise on Facebook platforms.  The alternative is to omit more than 70% of the social media market as measured by share of visits.

27.     Plaintiffs have been advertising on Facebook since at least early 2019.  As of late 2020, Plaintiffs were spending over $100,000 per month on Facebook ads.  Most of the ads have related to the golf instruction services or golf training aids offered by Scratch Golf Academy LLC and Lag Shot Golf LLC.  Both companies' Facebook accounts are managed by their common founder and owner, Mr. Gary Guerrero ("Guerrero").

28.     Facebook's Terms of Service[18]  provide that the Self-Serve Ad Terms,[19] Advertising Policies[20] and Commercial Terms[21] apply to business advertising customers. The Self-Serve Ad Terms indicate that ad services provided by Facebook are subject to the Advertising Policies.

29.     The Advertising Policies ("Advertising Policies") indicate the steps an advertising customer is to take if an ad is disapproved.  In particular, the Advertising Policies indicate that "[i]f your ad doesn't get approved, we'll send you an email with details that explain why" and that, using that information, the ad customer will be able to create a compliant ad. The salient portion of the Advertising Policies is reproduced below.

> If your ad isn't approved for not fully complying with our policies, you can edit it and resubmit for review. To edit your ad:
> - Check the email address associated with your advertising account. If your ad doesn't get approved, we'll send you an email with details that explain why.
> - Using the information in your disapproval email, you can edit your ad and create a compliant one. Check this page for editing steps.
> - Save your edited changes. Once you save your changes, your ad will be resubmitted for review.

---

[18]https://www.facebook.com/legal/terms.
[19] https://www.facebook.com/legal/self_service_ads_terms.
[20] https://www.facebook.com/policies/ads.
[21] https://www.facebook.com/legal/commercial_terms.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

30.     Starting at least as early as the second quarter of 2019, Plaintiffs periodically received ad rejection notifications in their corresponding Facebook account portals.  However, neither the notifications nor any corresponding emails included information sufficient to identify the alleged defect in the ad.  Rather, the notifications and emails generally referred only to an alleged failure to comply with an unidentified advertising policy.  As seen in the representative email, reproduced below, no explanation was provided.  When Plaintiffs navigated to the pages to which the View Ad buttons were directed, the notification was similarly generic and unspecific.

Facebook Ads Team <advertise-noreply@support.facebook.com>
To  Gary Guerrero Jr
(i) If there are problems with how this message is displayed, click here to view it in a web browser.

 Fix your ad or request a review

Hi ,

Your ad was rejected because it doesn't comply with our advertising policies.

To learn more, view your ad in Account Quality. You can request a review if you think your ad was incorrectly rejected.



This message was sent to lgnwealthmentor@gmail.com. If you don't want to receive these emails from Facebook in the future, please unsubscribe.
Facebook, Inc., Attention: Community Support, 1 Facebook Way, Menlo Park, CA 94025
To help keep your account secure, please don't forward this email. Learn More

31.     Being unable to decipher the reasons underlying certain ad rejections, in late 2019, Guerrero hired a digital marketing agency specializing in Facebook advertising.  That marketing agency had access to its own dedicated Facebook account representative who, in

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

1    response to the agency's query, explained that certain of Plaintiffs' ads apparently violated a

2    Facebook policy against "split testing" of websites.  That policy was not and, it is believed, still

3    is neither identified nor explained anywhere on any publicly accessible Facebook pages.

4         32.    Because the notifications sent by Facebook contained little more than a

5    generalized reference to the Advertising Policies, Guerrero – a sophisticated user who runs a

6    digital marketing consultancy – was unable to determine how to fix his ads and bring them into

7    compliance with Facebook's policies.  Rather, he needed to hire a third-party digital advertising

8    agency who had access to a dedicated, live Facebook representative.  Facebook's Terms of

9    Service and policies fail to inform customers that such specialized expertise or VIP access to

10   Facebook representatives may be necessary to successfully navigate Facebook's Advertising

11   Policies and ad review process.

12        33.    On information and belief, even such expertise and VIP access to Facebook

13   representatives is currently insufficient to successfully navigate Facebook's Advertising Policies

14   and review process in many circumstances.  According to an online message board, even

15   Facebook representatives have been unable to determine why their own ad accounts have been

16   disabled, and in one such instance a Facebook representative reported that he was advertising on

17   his mother's account for several months while the automated review was pending.[22]

18        34.    During the remainder of 2020, Facebook sent Plaintiffs at least a dozen ad

19   rejection notifications, none of which included or directed Plaintiffs to an explanation of the

20   alleged problem with any of the ads, in direct contradiction of Facebook's own Advertising

21   Policies.  Some of the notifications indicated that the account had been disabled for

22   "circumventing systems policy," but merely included a copy of the corresponding paragraph

23   from the Facebook Advertising Policies without any suggestion for remedial action.  Most of the

24

25

26

27   [22] https://www.reddit.com/r/PPC/comments/l65q4v/heres_proof_that_facebook_is_a_mess_right_now/, last
     accessed on Feb. 2, 2021.

28
     COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH
     OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND
     FRAUD

notifications, however, did not even identify which policy or policies supposedly triggered the rejection.

35.     In most or all of these situations, Plaintiffs simply appealed the rejection since they were unable to decipher how the ads were noncompliant or how they were circumventing any enforcement effort.  Shortly after each appeal, Plaintiffs received a notification that the ads or advertising privileges had been "incorrectly disabled" or simply stating that the ads or privileges would be "reactivated."  This is the same experience generally reported by many Facebook advertisers.[23]

36.     Plaintiffs took the appeal decision notifications at face value and, based thereon, reasonably concluded that their activities did not in fact circumvent any systems policy as suggested by some of the rejection or "account disabled" notifications.

37.     On or about January 6, 2021, Guerrero received yet another notification that indicated his ads violated some unspecified policy:



Today at 8:32 AM
Hi Gary,

After further review of your Facebook account, we found you didn't comply with our Advertising Policies (https://www.facebook.com/policies/ads) or other standards. You will no longer be allowed to advertise and your access to features for managing ad and business accounts will remain limited.
The Facebook Business Team

38.     As he had in the past, Guerrero filed an appeal, expecting the same result – that a Facebook representative would respond that the ad had been "incorrectly disabled."  However, in response to this appeal, Facebook informed Guerrero that all accounts under his management,

---

[23] *See* https://www.reddit.com/r/PPC/comments/bku8j2/facebook_disabled_my_ad_account_i_have_appealed_5/; https://www.nytimes.com/2021/02/11/style/disabled-fashion-facebook-discrimination.html?referringSource=articleShare.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

including Scratch Golf Academy LLC, Lag Shot Golf LLC, and GGG Marketing LLC, were completely stripped of all advertising privileges.  Following the appeal, Guerrero sought further guidance, and Facebook responded that his account would not be reactivated but rather that Guerrero would need to wait at least several weeks for an unspecified review process to occur.

39.     On February 5, 2021, Plaintiffs received an email from a Facebook representative concerning the appeal.  The email stated that the "specific policy or policies violated" were not shared with the Facebook representative (and thus obviously were not being shared with Plaintiffs). The email provided only a vague assertion that the account may have been suspended due to noncompliance with Advertising Policies, Community Standards, or the Terms of Use, or alternatively reasons relating to Plaintiffs' payment history "and the like."  The body of the email is reproduced below.

> Hi Gary,
>
> This is Mary from Facebook Concierge Support. I hope you are doing well. I am writing about your concern on disabled Ad Account.
>
> Upon checking, I found out that his profile and Ad Account has been flagged for non-compliance in our Advertising Policies. You may review our policies through this link:https://www.facebook.com/policies/ads. You may also visit this help center link for more information: https://www.facebook.com/business/help/975570072950669.
>
> What's visible to us is only the status of the account. Having said this, the specific policy or policies violated is not shared to us as either. However, I can give you an idea. Please note there are a lot of factors being considered for being disabled due to a violation of our policies - some of which is non-adherence to the Advertising Policies, non-compliance to our Community Standards, and Facebook Terms of Use, your Ad Account payment history, and the like.
>
> To make sure that you are fully supported, apart from the links I shared earlier, I am sharing this link with you as well: https://www.facebook.com/communitystandards/
>
> For this issue, the Admin can file an appeal here https://www.facebook.com/accountquality

40.     As noted above, Plaintiffs collectively had been spending over $100,000 per month on Facebook advertising in reliance on the understanding that Facebook would comply with its policies and provide Plaintiffs guidance on how allegedly noncompliant ads could be made compliant.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

41.     Given Facebook's failure to comply with its stated Advertising Policies, Plaintiffs have been unable to remedy the alleged defects in their advertisements and have suffered economic harm as a result of their inability to advertise on Facebook.

42.     The New York Times has reported that many advertising customers have had strikingly similar experiences.  In a February 11, 2021 article, the New York Times reported that several businesses selling adaptive clothing had their ads suspended without the promised explanation, namely, a detailed explanation sufficient to create a compliant ad.[24] Rather, in the rejection notifications, the "word or part of the image that created the problem is not identified, meaning it is up to the company to effectively guess where the problem lies."[25]  One business, being utterly unable to determine how to create compliant ads, started a remedial "petition" on change.org. [26]  After the petition received 800 signatures, Facebook lifted the restrictions on that business.[27]

43.     Another business reported that it is "impossible" to create compliant ads without the help of an "outside media buying agency" who "could actually get a Facebook person on the phone." [28] Yet another business reported that it had at least 200 ads rejected due to vague and unspecified "policy violations." [29]  That business owner was "exhausted by the constant attempts to reason with the void of an algorithm." [30] The New York Times article quoted a professor as observing that "'[a]lgorithms solve the problem of efficiency at grand scale' — by detecting patterns and making assumptions — 'but in doing that one thing, they do all sorts of other things, too, like hurting small businesses.'"[31]

---

[24] *See* https://www.nytimes.com/2021/02/11/style/disabled-fashion-facebook-discrimination.html?referringSource=articleShare.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*

Page **13** of **33**

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

44.     As noted above, Business Insider recently reported Facebook disabled an ad account without explanation despite the fact that the owner had spent $46 million on Facebook advertising from 2006 to 2020.  Facebook's decision to completely disable that business' advertising privileges "without warning or explanation" caused the loss of pages that had amassed "25 million enthusiastic fans" that had been accumulated over the course of many years.[32]  The revocations came without warning, as "Facebook's own Page Quality tab showed that all of [the business'] pages were green (no violations)."[33]  When the business sought an explanation, Facebook responded that "[u]nfortunately, for safety and security reasons, we can't give you any additional information as to why your account was disabled. For more information about our policies, please review the Facebook terms."[34] The business owner reported that:

> Facebook has systematically shut down our 2 small businesses during a pandemic and economic crisis without explanation. Part of me is still convinced that it was a glitch in their system and nobody has taken the time to fully review it. Another part of me thinks someone saw something they didn't like, didn't take the time to understand it and won't give us the chance to explain it and make it right.

45.     Similar stories are ubiquitous on discussion boards. Selected excerpts from a representative January 2021 discussion board thread are reproduced below: [35]

- "I just got my ad account restricted a few days ago after 6 years and hundreds of thousands spent. I have no idea why. . . . I submitted a request for review but who knows when they'll get back to me. Seems to me like this is happening to a LOT of people right now though."

---

[32] https://jordan-shared.medium.com/after-spending-over-57-million-on-facebook-ads-they-kicked-me-and-my-pages-off-without-warning-c6d7e611b01c.
[33] *Id*.
[34] *Id*.
[35] https://www.reddit.com/r/PPC/comments/l65q4v/heres_proof_that_facebook_is_a_mess_right_now/, last accessed on Feb. 2, 2021.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

- "I had my longest standing account disabled last week for no reason I can isolate. Of course Facebook's support is just a micro-step above non-existent too. So much fun!"

- "This happened to me as well today. Haven't run ads or touched anything for several months, ~50k spent on the account. Ridiculous"

- "I had 3 accounts banned and now get no support responses. This has been causing chaos amongst the direct-response/performance marketing community for months. FB has become hypersensitive, gives no details, this 'compliance team' review comment is completely fake -- the accounts are being disabled using AI tools, not real compliance team members reviewing something. This is improbable as the scale is too large for humans to be individually reviewing these accounts and the reasons for the disabling."

46.     On information and belief, Facebook made the conscious and deliberate decision to withhold the explanations promised in its Advertising Policies to minimize cost and maximize profit by implementing an AI-based ad review system without appropriate human supervision and management.

47.     Facebook has failed to devote appropriate resources such as human contractors and employees to help advertisers and ensure that users comply with Facebook's policies.  As noted above, Plaintiffs received an email on February 5, 2021 stating that even Facebook's appeal representative was not informed of the reasons underlying the ad rejections or account suspensions.  A January 2021 discussion board post provided a screen shot of a chat session with a Facebook representative that appears to confirm that Facebook has been deliberately withholding explanations of policy violations: [36]

---

[36] *Id.*

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

1    •   "I duplicated an ad set on a long-time running campaign with no

2        rejected or disabled ads and suddenly I was banned. Support stated that

3        duplicating an ad set was against policy. I asked why. This is what

4        they said...

5

           Sure, thank you. Is duplicating an ad set against some policy that I am unaware of?

6

7           Well to answer it should have not affect the quality of your account, Chris. About
          the specific policy violation, this information is strictly confidential to the internal

8           Policy team. Due to the nature of their department, they are unable to provide
          any additional information on what policies are violated or why this decision was

9    made as this information becoming external could lead to potential misuse of
          the platform.

10        I do minimal advertising on Facebook because of **** just like

11        this. It's literally the only ad platform I've ever used that you can

12        get an account banned or restricted simply for using it's function.

13        Oh, and FYI I only duplicated it so I could make one small change

14        while retaining data from the old ad set. Very common practice.

15        Sorry for the rant, but at least this wasn't another cookie-cutter "my

16        account was banned!" post. I'm just as tired of those as you all are,

17        I'm sure. I'm honestly just super thankful that I don't rely on

18        Facebook for my businesses and empathize will the many small

19        and medium businesses that struggle to make ends meet when this

20        **** happens to them."

21      48.     On information and belief, and as suggested in this discussion thread, many

22 enterprises have been driven out of business by Facebook's deliberate refusal to provide the

23 promised explanations during the ad review process. On information and belief, Facebook has

24 consciously refused to provide these explanations to reduce its internal costs (including the costs

25 associated with hiring the staff necessary to provide the promised explanations) and limit its own

26 liability and public relations risk at the expense of business owners around the world.

27

28

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH
OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND
FRAUD

49.     Facebook could have, but chose not to, devote additional resources to ensure that Facebook was living up to its promise to send users emails with details that explain why ads are rejected such that, using the information in the disapproval email, users can edit the ads and create compliant ones. [37]

50.     In deciding to purchase ads or continue purchasing ads, Plaintiffs and other Facebook business advertisers reasonably and specifically relied on Facebook's representations that Facebook would provide advertising customers with information sufficient to create compliant ads.  Plaintiffs and other Facebook business advertisers also reasonably and specifically relied on the fact that Facebook had at a minimum an implied duty to provide explanations sufficient to enable ad customers to prevent their ad campaigns from being shut down and ad privileges from being suspended or revoked without recourse and without explanation.

51.     This Court should issue a public injunction ordering Facebook to, *inter alia*, immediately comply with the representation it makes in its Advertising Policies, which are incorporated into the Facebook Terms and Conditions.  The public injunction should be on behalf of the general public, including at least nearly 10 million Facebook business advertisers, and should bar Facebook from, *inter alia*, rejecting ads without first providing the promised explanations, namely, explanations which are sufficiently detailed to enable each advertiser to create a compliant ad.

## FIRST CAUSE OF ACTION

### Violations of California Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200, *et seq.*

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

---

[37] *See id.*; https://www.facebook.com/policies/ads.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

53.     Facebook violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, by engaging in fraudulent business acts or practices, engaging in unfair business acts or practices, engaging in acts prohibited by §§ 17500 through 17577.5, and disseminating unfair, deceptive, untrue, or misleading advertising as alleged previously and as further specified below.

54.     Facebook's Advertising Policies advertise to potential consumers of the advertising services that Facebook will provide an explanation sufficient for the user to create a compliant ad during the ad review process.  Facebook's advertising in that regard is false.

55.     Facebook's false advertising was designed to induce the public, including Plaintiffs, to purchase advertising services from Facebook.  Facebook's practices deceived the public into believing that when the public purchases advertising services from Facebook, the public will receive instruction as to how to bring an allegedly noncompliant ad into compliance with Facebook's policies.

56.     Facebook's deliberate decision to withhold the promised explanations during the ad review process is unscrupulous, and substantially injurious to business advertising purchasers, and thus constitutes an unfair practice under the UCL.

57.     Facebook's practice was also contrary to legislatively declared public policies that seek to protect consumers from misleading statements, as reflected by laws like the Federal Trade Commission Act (15 U.S.C. § 45), Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*), and California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200). The harm these practices caused to Plaintiffs and the other businesses advertising on Facebook outweigh their utility, if any.

58.     Prior to deciding to advertise and/or continue advertising on Facebook in 2019, Plaintiffs read and reasonably relied upon the Advertising Policies, including specifically the provisions explaining that when an ad is rejected, Facebook would provide an explanation sufficient to enable the user to create a compliant ad.  Plaintiffs understood that the Advertising

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

Policies constituted an affirmative representation and contractual commitment by Facebook to provide such explanations. Plaintiffs understood that the Advertising Policies provided the terms under which the advertising services would be provided by Facebook.

59.    Prior to deciding to continue advertising on Facebook in 2020, Plaintiffs read and reasonably relied upon the Advertising Policies, including specifically the provisions explaining that when an ad is rejected, Facebook would provide an explanation sufficient to enable the user to create a compliant ad.  Plaintiffs understood that the Advertising Policies constituted an affirmative representation and commitment by Facebook to provide such explanations. Plaintiffs understood that the Advertising Policies provided the terms under which the advertising services would be provided by Facebook.

60.    On information and belief, prior to deciding to advertise or continue advertising on Facebook in 2019 to present, other businesses advertising on Facebook read and reasonably relied upon the Advertising Policies, including specifically the provisions explaining that when an ad is rejected, Facebook would provide an explanation sufficient to enable the user to create a compliant ad.  Other businesses advertising on Facebook understood that the Advertising Policies constituted an affirmative representation and commitment by Facebook to provide such explanations. Other businesses advertising on Facebook understood that the Advertising Policies provided the terms under which the advertising services would be provided by Facebook.

61.    Facebook's failure to provide the promised explanations during the ad review process is unscrupulous and gave it an unfair competitive advantage, as it allowed Facebook to provide advertising services at a lower cost and, during the ad sales process, made those advertising services appear to be more valuable than they were.  Facebook could have, but deliberately chose not to, devote appropriate resources to supply the promised explanations. Instead, Facebook chose to maximize its profits, which grew to $29.1 billion in 2020.[38]

---

[38] https://www.investopedia.com/ask/answers/120114/how-does-facebook-fb-make-money.asp.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

62. Plaintiffs have standing to bring these claims under the UCL because they were injured and lost money or property, including but not limited to money paid toward Facebook advertisements, as a result of Facebook's fraudulent and unfair business practices. Among other things, Plaintiffs would not have bought as much in advertising services if Facebook had disclosed that it would not provide explanations during the ad review process and that ad campaigns or ad privileges could be revoked or suspended at any time without explanation.  If Facebook had disclosed this, Plaintiffs would have paid a lower price for the advertising services they did purchase.

63. Due to Facebook's violation of the UCL, Plaintiffs and other businesses advertising on Facebook failed to receive the benefit of contract, including the bargained-for benefit in exchange for their investments of months or years of time and resources building online Facebook presences, learning Facebook's systems, developing Facebook ad campaigns and acquiring Facebook followers. Plaintiffs paid Facebook hundreds of thousands of dollars and devoted at least hundreds of hours to building online Facebook presences, learning Facebook's systems, developing Facebook ad campaigns and acquiring Facebook followers.  Plaintiffs would not have done so or would have done so to a much lesser extent, but for Facebook's misrepresentations.

64. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek equitable relief to prevent Facebook's unfair and fraudulent practices for the benefit of Facebook advertisers, including especially the nearly 10 million business advertisers such as Plaintiffs.  This Court should award a public injunction preventing Facebook from rejecting ads or restricting advertising privileges without providing the promised explanations, namely, detailed explanations which enable each advertiser to create a compliant ad.

65. Facebook also violated California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq*., by engaging in unlawful business acts and practices.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ*., BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

66.    Facebook has violated the unlawful prong of the UCL by including in its terms of use various provisions that are unconscionable. *De La Torre v. CashCall, Inc*., 422 P.3d 1004, 1012-14 (Cal. 2018) (holding that unconscionability can be asserted affirmatively under the UCL's unlawful prong). Unconscionable contracts are unlawful under California law and thus may serve as the predicate for a claim under the lawful prong of the UCL. Cal. Civ. Code § 1670.5 (2020) (declaring unconscionable contracts unlawful).

67.    Facebook's anticompetitive behavior and related monopoly power or market dominance provide it with substantial leverage, which Facebook uses to include unconscionable provisions in its adhesion contracts.

68.    Facebook's behavior and market dominance are directly relevant to the issue of unconscionability. Procedural unconscionability focuses on oppression or surprise due to unequal bargaining power, while substantive unconscionability focuses on overly-harsh or one-sided terms. *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1532 (1997). "Courts apply a sliding scale: 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'" *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1072 (9th Cir. 2007). Furthermore, "a claim of unconscionability often cannot be determined merely by examining the face of the contract, but will require inquiry into its setting, purpose, and effect." *Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 926 (1985).

69.    Facebook's Community Payment terms includes the following unconscionable provision:

> If you believe that an unauthorized or otherwise problematic
> transaction has taken place under your account, you agree to notify
> us immediately, so that we may take action to prevent financial
> loss. Unless you submit the claim to us within 30 days after the
> charge, you will have waived, to the fullest extent permitted by

law, all claims against us arising out of or otherwise related to the

transaction.[39]

70.     As this Court held in *dotStrategy Co. v. Facebook, Inc.*, 3:20-cv-00170 (N.D. Cal

Aug. 28, 2020), "Facebook's waiver provision [in the Payment Terms] is unenforceable because

thirty days was an unreasonably short period of time for plaintiff to identify, investigate, and

then bring a claim."[40]

71.     Plaintiffs have suffered harm by inclusion of the above-quoted Payment Terms to

the extent that they purport to limit Plaintiffs' ability to recover their actual damages, which

exceed the amounts charged by Facebook within the last thirty days.

72.     As another example, Facebook's terms include an arbitration clause coupled with

a class action waiver that is unconscionable at least in the context of an adhesion contract with

Facebook, a company with a monopoly or otherwise dominant power in the social media

market.[41]  Facebook's terms include at least the following unconscionable provision:

> You agree to arbitrate Commercial Claims between you and Facebook,
> Inc. This provision does not cover any commercial claims relating to
> violations of your or our intellectual property rights, including, but not
> limited to, copyright infringement, patent infringement, trademark
> infringement, violations of the Brand Usage Guidelines, violations of your
> or our confidential information or trade secrets, or efforts to interfere with
> our Products or engage with our Products in unauthorized ways (for
> example, automated ways). If a Commercial Claim between you and
> Facebook, Inc. is not subject to arbitration, you agree that the claim must
> be resolved exclusively in the U.S. District Court for the Northern District
> of California or a state court located in San Mateo County, and that you

---

[39] https://www.facebook.com/payments_terms.
[40] D89 at 6.
[41] *See* https://gs.statcounter.com/social-media-stats.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH
OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND
FRAUD

submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim.

We and you agree that, by entering into this arbitration provision, all parties are waiving their respective rights to a trial by jury or to participate in a class or representative action.  THE PARTIES AGREE THAT EACH MAY BRING COMMERCIAL CLAIMS AGAINST THE OTHER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING.[42]

As the California Supreme Court held in *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), a contract provision that purports to waive a customer's right to seek public injunction in any form is unenforceable. The above-quoted provisions are unconscionable for at least substantially the same reasons discussed in *McGill*.  The class action waiver is itself unconscionable at least in the narrow context of an adhesion contract with Facebook, which holds a monopoly or otherwise dominant position in the social media advertising market.

73.     Plaintiffs have also been harmed by the class action waiver in the Commercial Terms, including to the extent that it purports to limit Plaintiffs' ability to bring a legal action to seek redress for the injuries discussed herein.

74.     Further, Facebook's terms include a waiver of punitive damages and other limitations of liability that are unconscionable at least in the narrow context of an adhesion contract with Facebook, a company with monopoly or otherwise dominant power in the social media market.  Facebook's terms include at least the following unconscionable provision:

We cannot predict when issues might arise with our Products.

Accordingly, our liability shall be limited to the fullest extent

---

[42] https://www.facebook.com/legal/commercial_terms.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

permitted by applicable law, and under no circumstance will we be liable

to you for any lost profits, revenues, information, or data,

or consequential, special, indirect, exemplary, punitive, or incidental

damages arising out of or related to these Terms or the

Facebook Products, even if we have been advised of the possibility of

such damages. Our aggregate liability arising out of or

relating to these Terms or the Facebook Products will not exceed the

greater of $100 or the amount you have paid us in the past

twelve months.[43]

75.   The above-quoted provisions are unconscionable for at least the reason that they purport to permit Facebook to evade monetary and punitive damages even in the case of wanton and willful conduct. *See Silicon Valley Self Direct, LLC v. Paychex, Inc.*, No. 5:15–cv–01055, 2015 WL 4452373 (N.D. Cal. Jul. 20, 2015) (finding waiver of "special, indirect, incidental, or consequential or punitive damages" in adhesion contract to be procedurally and substantively unconscionable).

76.   The unconscionability of Facebook's punitive damage waiver is further demonstrated by the fact that it is in direct violation of the Consumers Legal Remedies Act § 1751, which provides that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." That statutory provision has been in force and effect since 1970, and Facebook's punitive damage waiver constitutes a deliberate and illegal attempt to deprive consumers of the protections provided by California law.

77.   Plaintiffs are harmed by this provision because Plaintiffs have suffered damages which exceed the amount paid by Plaintiffs in the past twelve months and because Plaintiffs are entitled to an award of punitive damages for Facebook's brazen, deliberate, and false representations and failure to abide by its own terms of service.

---

[43] https://www.facebook.com/terms.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

78.     Plaintiffs seek public injunctive relief barring Facebook from attempting to enforce such unconscionable provisions against any business advertiser such as Plaintiffs. This Court should issue an injunction on behalf of the general public, including at least nearly 10 million Facebook business advertisers, barring Facebook from attempting to enforce any contract provision deemed unconscionable by this Court.

## SECOND CAUSE OF ACTION

### Breach of Contract

79.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

80.     Plaintiffs and other businesses in the general public advertising on Facebook contracted with Facebook to provide them with advertising services. They did so through one or more of Facebook's advertising interfaces, where businesses advertising on Facebook can submit advertisements for approval, set a daily advertising budget that can be adjusted at any time, set or adjust their target audience, and set or adjust the placement of the advertising.

81.     Plaintiffs met all or substantially all of their contractual obligations, including submitting their advertising for Facebook's approval and paying for Facebook's advertising services.

82.     There is not one integrated contract that spells out Facebook's obligations to Plaintiffs, but those obligations can be determined by reference to Facebook's course of dealing with Plaintiffs, industry practice, and from various webpages created by Facebook, including Facebook's Terms of Service;[44] Facebook's Self-Serve Ad Terms;[45] Facebook's Advertising Policies;[46] Facebook's Advertiser Help Center;[47] Facebook's Community Payments Terms;[48] and Facebook's ad-creation, editing, and management interfaces, which may be accessed through

---

[44] https://www.facebook.com/legal/terms.
[45] https://www.facebook.com/legal/self_service_ads_terms.
[46] https://www.facebook.com/business/help.
[47] https://www.facebook.com/business/help/169249477193317.
[48] https://www.facebook.com/payments_terms.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

Facebook's Ads Manager,[49] Facebook's Power Editor,[50] Facebook's Ads Manager App, Facebook Pages, and Facebook Ads API.

83.     One of Facebook's obligations is to provide businesses advertising on Facebook an explanation of why an ad is being rejected or advertising privileges are being suspended or revoked.  For example, the Advertising Policies provide that "[i]f your ad doesn't get approved, we'll send you an email with details that explain why" and that, using that information, the ad customer will be able to create a compliant ad.

84.     Facebook has breached its contractual obligation to the public, including Plaintiffs, by rejecting ads without the promised explanation, which was the direct and proximate cause of the restriction or revocation of many business advertisers' advertising privileges.

85.     Facebook could have, but deliberately chose not to, devote appropriate resources (including human employees or contractors) to help supply the promised explanations.  Instead, Facebook chose to maximize its profits, which swelled to $29.1 billion in 2020.[51]

86.     As a result, Plaintiffs and other businesses advertising on Facebook purchased advertising services they would not otherwise have purchased and failed to receive the benefit of their bargain.

87.     This Court should award an injunction on behalf of the general public, including at least nearly 10 million Facebook business advertisers, preventing Facebook from rejecting ads without first providing the promised explanations, namely, explanations which are sufficiently detailed to enable each advertiser to create a compliant ad.  Broad injunctive relief is appropriate in this circumstance, particularly because Facebook has inserted a class action waiver into its non-negotiable terms of use.

---

[49] https://www.facebook.com/ads/manager/creation/.
[50] https://www.facebook.com/ads/manage/powereditor.
[51] https://www.investopedia.com/ask/answers/120114/how-does-facebook-fb-make-money.asp.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

### THIRD CAUSE OF ACTION

#### Breach of Implied Covenant of Good Faith and Fair Dealing

88.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

89.     Plaintiffs met all or substantially all of their contractual obligations, including submitting their advertising for Facebook's approval and paying for Facebook's advertising services.

90.     Facebook's Advertising Policies include the following contractual provision:

> If your ad isn't approved for not fully complying with our policies, you can edit it and resubmit for review. To edit your ad:
> - Check the email address associated with your advertising account. If your ad doesn't get approved, we'll send you an email with details that explain why.
> - Using the information in your disapproval email, you can edit your ad and create a compliant one. Check this page for editing steps.
> - Save your edited changes. Once you save your changes, your ad will be resubmitted for review.

91.     Under California law, Facebook was required to perform its contractual obligations in good faith and to avoid any acts or material omissions which unfairly interfere with the right of any other party to receive the benefits of the contract.

92.     This duty required Facebook to provide business advertisers i) fair advance notice and warning that advertising privileges may be suspended or revoked, and ii) a reasonable opportunity to make the appropriate corrections or take the appropriate steps to avoid such suspension or revocation.  A reasonable business advertiser would have expected these basic steps as part of the benefit of the bargain relating to the above-quoted contractual provision.

93.     Facebook breached its implied duty of good faith and fair dealing by suspending or revoking advertising privileges without explanation. Had Facebook met its duty of good faith and fair dealing, it would have provided explanations that would have enabled ad customers to create compliant ads and thereby retain their advertising privileges.

94.     Had Facebook met its duty of good faith and fair dealing, it also would have provided separate explanations detailing the connection, if any, between individual ad rejections and the suspension or revocation of advertising privileges.

95.     Had Facebook met its duty of good faith and fair dealing, it further would have provided users a reasonable opportunity to remediate any perceived problems and thereby avoid suspension or revocation of their advertising privileges.

96.     Due to Facebook's breach of its duty of good faith and fair dealing, Plaintiffs and other businesses advertising on Facebook failed to receive the benefit of contract, including the bargained-for benefit in exchange for their investments of months or years of time and resources building online Facebook presences, learning Facebook's systems, developing Facebook ad campaigns and acquiring Facebook followers.

97.     This Court should award an injunction on behalf of the general public, including at least nearly 10 million Facebook business advertisers, requiring Facebook to comply with its duty of good faith and fair dealing and preventing Facebook from rejecting businesses' ads or restricting their advertising privileges without i) fair advance notice and warning that advertising privileges may be suspended or revoked, and ii) a reasonable opportunity to make the appropriate corrections or take the appropriate steps to avoid such suspension or revocation. Broad injunctive relief is appropriate in this circumstance, including because Facebook has inserted a class action waiver into its non-negotiable terms of use.

## FOURTH CAUSE OF ACTION

### Fraud

98.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

99.     Facebook falsely represented that it would provide during the ad review process an explanation of the policy violation to enable the advertiser to create a compliant ad.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

100.     On information and belief, Facebook made the conscious, willful and deliberate decision to cease providing the promised explanations during the ad review process at least in part to reduce internal costs, including the costs of hiring human employees or contractors to help provide the promised explanations. Facebook could have, but deliberately chose not to, devote appropriate resources (including but not limited to human employees or contractors) to ensure that the promised explanations for ad rejections were supplied to business advertisers. Instead, Facebook chose to maximize its profits, which burgeoned to $29.1 billion in 2020.[52]

101.     Facebook knew or should have known that the foregoing would cause widespread and substantial injury to its advertising customers, including because advertisers purchase ads in reasonable reliance that their ads, campaigns, and pages will not be terminated without explanation.

102.     Facebook intended that Plaintiffs and other businesses advertising on Facebook rely on the representation that Facebook would provide during the ad review process explanations that are sufficient to enable the user to create a compliant ad. To this day, Facebook promotes this aspect of its service on its website. Facebook knew that such feedback was critical for users to navigate Facebook's Advertising Policies and avoid being shut down by Facebook's automated "bots." Facebook concealed its decision to refuse providing the promised explanations during the ad review process because it knew that would erode user trust and result in advertisers purchasing fewer ads.

103.     Plaintiffs and other businesses advertising on Facebook did rely on Facebook's representation that Facebook would provide during the ad review process explanations that are sufficient to enable the user to create a compliant ad. As a result of Facebook's decision to continue advertising this aspect of its service, Plaintiffs and other businesses advertising on Facebook purchased more advertising from Facebook than they otherwise would have and paid a higher price than they otherwise would have.

---

[52] https://www.investopedia.com/ask/answers/120114/how-does-facebook-fb-make-money.asp.

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

104.     Facebook's conduct as previously described constitutes oppression, fraud, or malice, and was authorized or ratified by Facebook's officers.

105.     Plaintiffs seek an award of compensatory and punitive damages. Facebook's conduct as previously described constitutes oppression, fraud, or malice, and was authorized or ratified by Facebook's officers.

106.     This Court should award an injunction on behalf of the general public, including at least nearly 10 million Facebook business advertisers, preventing Facebook from a) rejecting ads without first providing the promised explanations, namely, explanations which are sufficiently detailed to enable each advertiser to create a compliant ad, and b) rejecting businesses' ads or restricting their advertising privileges without i) fair advance notice and warning that advertising privileges may be suspended or revoked, and ii) a reasonable opportunity to make the appropriate corrections or take the appropriate steps to avoid such suspension or revocation. Broad injunctive relief is appropriate in this circumstance, including because Facebook has inserted a class action waiver into its non-negotiable terms of use.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

A.     An injunction on behalf of the general public, including at least nearly 10 million Facebook business advertisers, preventing Facebook from rejecting ads without first providing the promised explanations, namely, explanations which are sufficiently detailed to enable each advertiser to create a compliant ad;

B.     An injunction on behalf of the general public, including at least nearly 10 million Facebook business advertisers, preventing Facebook from rejecting businesses' ads or restricting their advertising privileges without i) fair advance notice and warning that advertising privileges may be suspended or revoked, and ii) a reasonable opportunity to make the appropriate corrections or take the appropriate steps to avoid such suspension or revocation;

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

1

C.      An injunction on behalf of the general public, including at least nearly 10 million

2 Facebook business advertisers, barring Facebook from attempting to enforce any contract

3 provision deemed unconscionable by this Court;

4

D.      Declaring Facebook's conduct to be wrongful, unfair and unconscionable, as

5 well as fraudulent;

6

E.      Restitution of all relevant fees paid to Facebook by Plaintiffs as a result of the

7 wrongs alleged herein in an amount to be determined at trial;

8

F.      Disgorgement of the ill-gotten gains derived by Facebook from its misconduct;

9

G.      Actual damages in the amount of $1,000,000, or according to proof;

10

H.      Statutory damages as permitted by law;

11

I.      Punitive and exemplary damages;

12

J.      Pre-judgment interest at the maximum rate permitted by applicable law;

13

K.      Costs and disbursements assessed by Plaintiffs in connection with this action,

14 including reasonable attorneys' fees pursuant to applicable law; and

15

L.      Such other relief as this Court deems just and proper.

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FRAUD

1

## **JURY TRIAL DEMAND**

2

Plaintiffs hereby request a jury trial for all issues so triable.

3

Dated:   March 3, 2021

Respectfully submitted,

4

5

6

Seth W. Wiener, California State Bar No. 203747
Law Offices of Seth W. Wiener

7

609 Karina Court
San Ramon, CA 94582

8

Telephone: (925) 487-5607
Email: seth@sethwienerlaw.com

9

10

W. Cook Alciati (*pro hac vice to be filed*)
Gardella Grace P.A.

11

80 M Street SE, 1st Floor
Washington D.C., 20003

12

Telephone: (703) 721-8379
Email: calciati@gardellagrace.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*, BREACH
OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND
FRAUD

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of this document has been served on all parties through counsel of record on March 2, 2021 via the Court's CM/ECF system.

_____

Seth W. Wiener